United States District Court
Southern District of Texas
**ENTERED**
November 17, 2020
David J. Bradley, Clerk

## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | | |
|---|---|---|
| RECIF RESOURCES, LLC, | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | CIVIL ACTION NO. H-19-2953 |
| | § | |
| JUNIPER CAPITAL ADVISORS, L.P., | § | |
| *et al.*, | § | |
| Defendants. | § | |

## <u>MEMORANDUM AND ORDER</u>

This case arises from unsuccessful discussions between the parties regarding a potential oil-and-gas development project. The case is now before the Court on two motions seeking summary judgment in connection with the claims asserted by Plaintiff Recif Resources, LLC ("Recif"). The first is the Motion for Summary Judgment ("Juniper's Motion") [Doc. # 130] filed by Defendants Juniper Capital Advisors, L.P., Juniper Capital Investments, LLC, Juniper Capital III, LP, and State Line Exploration, LLC (collectively, "Juniper").[1] The second pending motion is

---

[1]     Recif filed a Response [Doc. # 153] to Juniper's Motion, and a Supplement to its Response [Doc. # 157]. Defendants filed a Reply [Doc. # 158], Recif filed a Surreply [Doc. # 174], and Defendants filed a Surreply [Doc. # 181]. Defendants filed a Supplement [Doc. # 186] in support of their Motion, Recif filed a Supplement to its Response [Doc. # 188], and Defendants filed a Supplement to their Reply [Doc. # 191].

Recif's Motion for Summary Judgment on Breach of Contract and Misappropriation of Trade Secrets ("Recif's Motion") [Doc. # 135].[2]

The Court has carefully reviewed the record and the applicable legal authorities. Based on that review, the Court **denies** Recif's Motion and **grants** Juniper's Motion.

## I.   **BACKGROUND**

Recif's claims against Juniper are based on information that Recif provided to Juniper.  In October 2017, Kevin Voelte introduced Recif to Juniper.  Voelte, an investment banker, was assisting Recif in its search for private equity investment for an oil-and-gas development project in Recif's Area of Interest ("AOI") in the Louisiana Austin Chalk.[3]  Recif was asking potential private-equity investors "for a $100MM equity investment into the Recif Prospect in order to acquire mineral leases on 50,000 acres and to drill 13 wells on those leases over three years.  In the fourth year, Recif planned to sell the Recif Prospect and predicted a fourfold return for investors at oil prices averaging $50 a barrel."  First Amended Complaint

---

[2]     Defendants filed a Response [Doc. # 160] to Recif's Motion, and Recif filed a Reply [Doc. # 182].  Recif filed a Supplement [Doc. # 187] to its Motion, Defendants filed a Supplement to their Opposition [Doc. # 189], and Recif filed a Supplement to its Reply [Doc. # 190].

[3]     The Louisiana Austin Chalk is a geological formation of underground chalk located in central Louisiana and southwestern Mississippi.  It is part of the larger Austin Chalk formation.

("Complaint") [Doc. # 52], ¶ 29.  Paul C. Langlois and Steven M. Jones are Recif's sole principals.

To facilitate their discussions regarding Juniper's investment in the oil-and-gas project in Recif's AOI, Recif and Juniper entered into a Confidentiality Agreement that required Juniper to keep confidential all proprietary information that Recif provided to Juniper.[4]  *See* Confidentiality Agreement, Exh. 18 to Juniper's Motion, ¶ 2.   "Recif Information" is a defined term, referring to Recif's proprietary information.  *See id.*, ¶ 15.  Excluded from Juniper's "obligations of secrecy" is information that:

a.   is or becomes part of the public domain through no fault of [Juniper] in violation of this Agreement, notwithstanding, however, RECIF electronic leashold [*sic*] shape/mapping files and the lease and property descriptions of the Properties related thereto shall not be construed as being part of the public domain;

b.   was in [Juniper's] possession prior to the time it was acquired hereunder; or

c.   was received by [Juniper] without any obligation of secrecy from a third party rightfully in possession of the Information and having no direct or indirect obligation of secrecy to RECIF that would prohibit the disclosure of such Information to [Juniper].

---

[4]   The Confidentiality Agreement provides that it "shall be governed by and construed in accordance with the substantive laws of the state of Louisiana."  Confidentiality Agreement, ¶ 18.  Throughout the parties' extensive briefing, they have cited to and argued Texas law with no suggestion that it differs in any material respect from Louisiana law.  Therefore, the Court applies Texas law, and deems the parties to have waived construction of the Confidentiality Agreement under Louisiana law.

*Id.*, ¶ 6.  Pursuant to the terms of the Confidentiality Agreement, Recif provided certain proprietary information to Juniper.  Recif describes its proprietary information as "secrets."  *See* First Amended Complaint ("Complaint") [Doc. # 52], ¶¶ 11, 13, 77.

In May 2018, Juniper terminated its discussions with Recif.  At approximately the same time, Juniper formed State Line Exploration LLC ("State Line").  State Line then entered into a business relationship with Amelia Resources, LLC ("Amelia"), from whom it obtained leases (the "State Line Leases") for properties outside the Recif AOI.  Recif alleges that in connection with Juniper's relationship with Amelia, Juniper improperly used and/or disclosed Recif's proprietary information in violation of the Confidentiality Agreement.  Recif states its allegations broadly to allege that everything Recif provided to Juniper was proprietary and was improperly used or disclosed by Juniper.  Following extensive discovery, however, primarily at issue are four well logs and a map with the outline of the Recif AOI ("Recif AOI Map").

In the Complaint, Recif asserts a breach of contract claim based on Juniper's alleged violations of the Confidentiality Agreement, and a trade secret misappropriation claim based on Juniper's alleged misuse of Recif's proprietary information which Recif alleges constitutes trade secrets.  Recif also asserts state law claims of fraudulent inducement, fraudulent misrepresentation, civil conspiracy,

"detrimental reliance/promissory estoppel," unfair competition, and unjust enrichment.

After comprehensive discovery, Juniper filed its Motion seeking summary judgment on all claims asserted against it.  Recif filed its Motion seeking summary judgment in its favor on its breach of contract and trade secret misappropriation claims.  The two motions have been fully briefed and are now ripe for decision.

## II.   **SUMMARY JUDGMENT STANDARD**

Rule 56 of the Federal Rules of Civil Procedure provides for the entry of summary judgment against a party who fails to make a sufficient showing of the existence of an element essential to its case and on which it will bear the burden at trial.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Curtis v. Anthony,* 710 F.3d 587, 594 (5th Cir. 2013); *Little v. Liquid Air Corp.,* 37 F.3d 1069, 1075 (5th Cir. 1994) (*en banc*).  Summary judgment "should be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  FED. R. CIV. P.  56(a); *Celotex*, 477 U.S. at 322-23; *Curtis*, 710 F.3d at 594.  Where the movant bears the burden of proof at trial on the issues at hand, it "bears the initial responsibility of demonstrating the absence of a genuine issue of material fact with respect to those issues."  *Transamerica Ins. Co. v. Avenell*, 66 F.3d

715, 718 (5th Cir. 1995); *see also Brandon v. Sage Corp.*, 808 F.3d 266, 269-70 (5th Cir. 2015); *Lincoln Gen. Ins. Co. v. Reyna*, 401 F.3d 347, 349 (5th Cir. 2005).

For summary judgment, the initial burden falls on the movant to identify areas in which there is an "absence of a genuine issue of material fact." *ACE Am. Ins. Co. v. Freeport Welding & Fabricating, Inc.*, 699 F.3d 832, 839 (5th Cir. 2012). The moving party may meet its burden by pointing out "the absence of evidence supporting the nonmoving party's case." *Malacara v. Garber*, 353 F.3d 393, 404 (5th Cir. 2003) (citing *Celotex*, 477 U.S. at 323; *Stults v. Conoco, Inc.*, 76 F.3d 651, 656 (5th Cir. 1996)).

If the moving party meets its initial burden, the non-movant must go beyond the pleadings and designate specific evidence showing that there is a genuine issue of material fact for trial. *Gen. Universal Sys., Inc. v. Lee*, 379 F.3d 131, 141 (5th Cir. 2004); *Littlefield v. Forney Indep. Sch. Dist.*, 268 F.3d 275, 282 (5th Cir. 2001) (internal citation omitted). "An issue is material if its resolution could affect the outcome of the action." *Spring Street Partners-IV, L.P. v. Lam*, 730 F.3d 427, 435 (5th Cir. 2013).

In deciding whether a genuine and material fact issue has been created, the court reviews the facts and inferences to be drawn from them in the light most favorable to the nonmoving party. *Reaves Brokerage Co. v. Sunbelt Fruit &*

*Vegetable Co.*, 336 F.3d 410, 412 (5th Cir. 2003).  A genuine issue of material fact

exists when the evidence is such that a reasonable jury could return a verdict for the

non-movant.  *Tamez v. Manthey*, 589 F.3d 764, 769 (5th Cir. 2009) (citing *Anderson*

*v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).

"'Conclusional allegations and denials, speculation, improbable inferences,

unsubstantiated assertions, and legalistic argumentation do not adequately substitute

for specific facts showing a genuine issue for trial.'"  *Pioneer Exploration, L.L.C. v.*

*Steadfast Ins. Co.*, 767 F.3d 503, 511 (5th Cir. 2014) (quoting *Oliver v. Scott*, 276

F.3d 736, 744 (5th Cir. 2002)); *accord Delta & Pine Land Co. v. Nationwide*

*Agribusiness Ins. Co.*, 530 F.3d 395, 399 (5th Cir. 2008).  Although the Court may not

make credibility determinations or weigh any evidence, the Court is not required to

accept conclusory allegations, speculation, and unsubstantiated assertions which are

either entirely unsupported, or supported by a mere scintilla of evidence.  *Chaney v.*

*Dreyfus Serv. Corp.*, 595 F.3d 219, 229 (5th Cir. 2010) (citing *Reaves Brokerage Co.*,

336 F.3d at 413); *accord, Little*, 37 F.3d at 1075.   Instead, the nonmoving party must

present evidence of specific facts that show "the existence of a genuine issue

concerning every essential component of its case."  *Firman v. Life Ins. Co. of N. Am.*,

684 F.3d 533, 538 (5th Cir. 2012) (citation and internal quotation marks omitted).  In

the absence of any proof, the court will not assume that the non-movant could or

would prove the necessary facts. *Little*, 37 F.3d at 1075 (citing *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 888 (1990)).

Affidavits cannot preclude summary judgment unless they contain competent and otherwise admissible evidence. *See* FED. R. CIV. P. 56(c)(4); *Love v. Nat'l Med. Enters.*, 230 F.3d 765, 776 (5th Cir. 2000); *Hunter-Reed v. City of Houston*, 244 F. Supp. 2d 733, 745 (S.D. Tex. 2003). A party's self-serving and unsupported statement in an affidavit will not defeat summary judgment where the evidence in the record is to the contrary. *See In re Hinsley*, 201 F.3d 638, 643 (5th Cir. 2000).

Finally, "[w]hen evidence exists in the summary judgment record but the nonmovant fails even to refer to it in the response to the motion for summary judgment, that evidence is not properly before the district court." *Malacara*, 353 F.3d at 405. "Rule 56 does not impose upon the district court a duty to sift through the record in search of evidence to support a party's opposition to summary judgment." *Id.* (internal citations and quotations omitted); *Williams v. Valenti*, 432 F. App'x 298, 302 (5th Cir. 2011).

## III.  **BREACH OF CONTRACT CLAIM**

### A.  **Legal Standards for Breach of Contract Claim**

"In Texas, breach of contract requires four elements: (1) a valid contract, (2) plaintiff's performance, (3) defendant's breach, and (4) resulting damages."

*Wease v. Ocwen Loan Servicing, L.L.C.*, 915 F.3d 987, 993 (5th Cir. 2019) (citing

*Henning v. OneWest Bank FSB*, 405 S.W.3d 950, 969 (Tex. App. -- Dallas 2013, no

pet.)).  "To determine the meaning of contractual terms, Texas courts focus on the

parties' intentions as expressed in the contract itself." *Wease*, 915 F.3d at 993 (citing

*Italian Cowboy Partners, Ltd. v. Prudential Ins. Co. of Am.*, 341 S.W.3d 323, 333

(Tex. 2011)).  "[W]hether the contract is ambiguous is itself a question of law for the

court to decide."  *Wease*, 915 F.3d at 993 (quoting *First Bank v. Brumitt*, 519

S.W.3d 95, 105 (Tex. 2017)).  A contract is not ambiguous simply because the parties

disagree about its interpretation.  *Wal-Mart Stores, Inc. v. Sturges*, 52 S.W.3d 711,

728 (Tex. 2001).

### B. Claim that Juniper Used Recif's Information in Violation of Confidentiality Agreement

Recif alleges that Juniper breached the Confidentiality Agreement by using

Recif's confidential information to decide to acquire the State Line Leases.  As noted

above, primarily at issue are four well logs and the Recif AOI Map.  It is undisputed

that the State Line Leases are outside the Recif AOI.

In connection with Recif's claim that Juniper breached the Confidentiality

Agreement by using Recif's information when evaluating and deciding whether to

invest in the State Line Leases, Juniper argues that the well logs are public

information not covered by the Confidentiality Agreement.  Juniper argues also that

it did not use Recif's information because the information was not relevant outside of Recif's AOI and because Juniper conducted its own analysis to guide its decision whether to invest in the State Line Leases.  To the extent Recif argues that Juniper improperly used mental impressions it retained from reviewing Recif's information, Juniper argues that it did not use any retained mental impressions and that the Confidentiality Agreement allows Juniper to use any retained mental impressions.

### 1.    Well Logs

The well logs that Recif provided to Juniper are not covered by the Confidentiality Agreement.  Paragraph 6 of the Confidentiality Agreement specifically and unambiguously excludes information that is "part of the public domain." Confidentiality Agreement, ¶ 6.  Although Recif is correct that "[w]ell logs do not hang from trees," it is undisputed that the four well logs at issue were publicly available from private vendors and paid subscription services.  *See* Surreply [Doc. # 174], p. 3.  Recif's Langlois testified that the well logs are publicly available for anyone to purchase.  *See* Paul Langlois Depo., Exh. 3 to Juniper's Motion, pp. 143-44, 256, 359.  Juniper's employee Chase Schrotel testified that the well logs are available free of charge from the Louisiana Department of Natural Resources SONRIS website. *See* Chase Schrotel Depo. [Doc. # 186], Exh. 1, p. 47.  Schrotel testified also that the public subscription services have filter options which would "absolutely" have

identified approximately "a dozen" well logs, including the same four well logs Recif provided, that satisfied the filter criteria.  *See id.* at 47.  According to Schrotel's sworn testimony, receiving the publicly-available well logs from Recif saved him "a couple of hours" search on public websites.  *See id.*  The uncontroverted evidence in the case establishes that the four well logs at issue were in the public domain and, therefore, were not subject to the Confidentiality Agreement's secrecy obligations.  As a result, any use of the four well logs by Juniper did not breach the Confidentiality Agreement.

## 2.    Relevance of Recif's Information Outside the Recif AOI

Juniper argues that it did not use Recif's information in connection with the State Line Leases because the Recif information was not relevant outside the Recif AOI.  There is no evidence that Recif provided information to Juniper that contained any analysis specific to the State Line Leases area.  It is undisputed that Recif did not conduct any well log analysis outside its own AOI and, specifically, did not conduct any well log analysis within the State Line Leases area.  Recif argues, therefore, that its analysis of the four well logs from wells within its AOI is relevant and applicable to the State Line Leases area outside Recif's AOI.  The uncontroverted evidence is to the contrary.

It is undisputed that the Recif AOI is 8-12 miles southwest of the State Line Leases area.  "[T]he geologic properties of the two areas vary dramatically."  Wayman

Gore Expert Report ("Gore Report"), Exh. 43 to Juniper's Motion, p. 21; *see also* Tope Ogunyomi Depo., Exh. 6 to Juniper's Motion, p. 230 ("geologically speaking, it's like night and day").  Recif's own analysis shows that there is significant variation in the porosity and thickness of the Recif AOI.  *See* Gore Report, p. 14.  The porosity more than triples across the Recif AOI, and the thickness increases 262% from the east to the west across the Recif AOI.  *See id.*  The farther away one moves from the Recif AOI, the larger the variation becomes.  *See id.*; *see also* Langlois Depo., p. 294 (testifying that the farther away one gets from the hard data points provided by the well logs, the greater the uncertainty).

Recif conducted an analysis for four well logs within the Recif AOI.  Juniper submitted the expert opinion that, as a result, the information Recif provided to Juniper "was insufficient to justify investment, particularly in areas outside of the Recif AOI."  *See* Gore Report, p. 21.  Gore states that the use of only four well logs to conduct a geologic analysis of the 400-square mile Recif AOI creates "extremely large uncertainty."  *See id.* at 16.  As Gore explains:

> Each of the four well logs used by Recif to map the Recif AOI would have a total  investigative area of 24 square inches or 2 square feet, with the total investigative area of the four logs combined being no more than 8 square feet.  This represents 0.00000073% of the Recif AOI or 7.3 ten-millionths of a percent.

*Id.*  It is Gore's expert opinion that this results in an inadequate analysis of the Recif AOI and, *a fortiori*, of the State Line Leases area.  *See id.* at 21.  Indeed, Gore states that in his 40 years as a petroleum engineer, he has "never seen anyone claim that a geological interpretation based on only 4 well logs in a very large area can be applied to a different area some ten miles away [because] the uncertainty of such an analysis is so great that it would have no probative value."  *See id.* at 18.  Gore opines that the "analysis inside the Recif AOI, as limiting as it was, simply could not have been used to evaluate the State Line [Leases area] some 10 miles away to the northeast."  *Id.* at 24.

In response to Juniper's evidence, Recif offers deposition testimony from Langlois and Voelte, the investment banker helping Recif obtain private equity financing.  Neither witness presents evidence that raises a genuine issue of material fact regarding whether the Recif information provided to Juniper was applicable to the State Line Leases.  During his deposition, Langlois drew a circle on a map and testified that Recif's information could be applied to all areas within the circle.  *See* Langlois Depo., pp. 362-63.  Langlois has neither been designated nor accepted by the

Court as an expert witness, and his opinion is inadmissible under Rule 701 of the
Federal Rules of Evidence.[5]

Voelte, who is also not designated as an expert, agreed during his deposition
that "it is possible for an AOI to shift as a negotiation with a private equity group
progresses." *See* Kevin Voelte Depo., Exh. 39 to Recif's Response [Doc. # 153],
p. 136. Voelte also testified as follows in response to questioning by Recif's counsel:

> Q.   Would you agree that Recif's information could, in fact, be
>      applied to the very region where [State Line Leases are] today?
>
> A.   I mean, maybe parts of it could, but I don't know for sure which
>      parts.
>
> Q.   But you think parts of it potentially could?
>
> A.   Potentially.

*Id.* at 171. This speculative testimony from a non-expert witness regarding mere
possibilities, coupled with Voelte's admission that he is not sure which parts of
Recif's information "maybe" could "potentially" apply to the State Line Leases area,

---

[5]   During Langlois's deposition, he also drew a red oval to designate the area on the map
where Recif's information would indicate drilling should not take place. As pointed
out during Langlois's deposition testimony, areas that Recif suggested to Juniper for
drilling were within the red "don't go" oval. *See* Langlois Depo., p. 368. Because
Langlois's opinion regarding the applicability of the Recif information outside Recif's
AOI lacks internal consistency and a valid methodology, it would likely be excluded
as unreliable under Rule 702 of the Federal Rules of Evidence even if Langlois had
been designated as a non-retained expert. *See, e.g.*, FED. R. EVID. 702; *Brown v.
Illinois Cent. R. Co.*, 705 F.3d 531, 536 (5th Cir. 2013).

does not raise a genuine issue of material fact regarding the applicability of Recif's information to the State Line Leases.

Recif argues that its information enabled Juniper to decide to obtain the State Line Leases. When Langlois was asked in his deposition what he believed Recif gave Juniper that allowed it to purchase the State Line Leases, he answered, "a tool chest that Recif put together that they could use to find out where to go and where not to go." *See* Langlois Depo., p. 361. As noted by Gore, the Recif information indicated that "where to go" would be the area west-northwest of the Recif AOI in order to maximize potential hydrocarbon volumes. *See* Gore Report, p. 15. It is uncontested that the State Line Leases are east-northeast of the Recif AOI. Evidence that Juniper's investment was outside the "where to go" area suggested by Recif's information is not evidence that Recif's information was applicable to the State Line Leases area or was used by Juniper to evaluate and obtain those leases.

Recif argues also that the Confidentiality Agreement states:

> WHEREAS, RECIF owns or controls certain information and data and has developed certain proprietary concepts and knowledge ("***Information***") with respect to oil and gas exploration generally on lands covered by any and all of the oil and gas exploration related agreements and leases of interest by RECIF and made a part hereof by this reference (the "***Properties***")[.]

Confidentiality Agreement, p. 1 (emphasis in original). Recif argues that it provided Juniper with maps showing lease ownership in the area, including the Amelia acreage.

Recif argues that the language cited above establishes that the Recif information applies to all areas on the lease ownership maps, including the area of the State Line Leases obtained from Amelia.  The uncontroverted evidence in the record establishes that Juniper had previously told Recif that it was interested in areas northeast of Recif's AOI, but Recif declined to conduct any analysis of those areas.  The maps on which Recif relies are devoid of any analysis and show only publicly available information regarding lease ownership.   The language in the Confidentiality Agreement, coupled with Recif's publicly-available maps, does not raise a genuine issue of material fact that Recif's information was factually relevant or applicable to the State Line Leases, or that Juniper used Recif's information to reach its decision regarding investment in the State Line Leases.

Juniper has presented substantial evidence that the information it received from Recif was not applicable to the State Line Leases area.  Recif has failed to present admissible evidence that raises a genuine issue of material fact on this issue.

### 3.    Juniper's Analysis

Recif concedes that if Juniper did not use Recif's information to reach its decision to invest in the State Line Leases and, instead, relied on its own analysis and information provided by other companies, there would be no breach of the Confidentiality Agreement.  *See* Steven Jones Depo., Exh. 2 to Juniper's Motion,

p. 269; Langlois Depo., p. 118.  Juniper has presented sworn testimony that it invested in the State Line Leases based on its own analysis and not on any information provided by Recif.  *See* Kevin Cumming[6] Depo., Exh. 1 to Juniper's Motion, pp. 225-26, 293 ("I'm a hundred percent telling you we did not use any information that Recif provided to us to decide to acquire acreage in the entirely separate area where we've acquired acreage."), 324; Schrotel Depo., Exh. 5 to Juniper's Motion, pp. 135, 153, 174, 238; Ogunyomi Depo., Exh. 6 to Juniper's Motion, pp. 219-20; Josh Schmidt[7] Depo., Exh. 44 to Juniper's Motion, p. 73.

Juniper has presented evidence of its prior work in the Austin Chalk and the Tuscaloosa Marine Shale ("TMS").[8]  As early as September 20, 2017, prior to its first business meeting with Recif in late November 2017, Juniper had begun mapping "life-to-date volumes" of wells in the Louisiana Austin Chalk, including Eagles Ranch well.  *See* Schrotel Depo., pp. 257-58.  Also prior to meeting with Recif, Juniper had obtained and reviewed maps of the TMS, including porosity maps and resistivity

---

[6]     Kevin Cumming is a partner at Juniper and a Manager at State Line.

[7]     Josh Schmidt is Juniper's Managing Director.

[8]     The TMS is a separate formation that is located beneath the Austin Chalk.  *See* Kirk Barrell Depo., Exh. 4 to Juniper Motion, p. 79.  The same formation is known in Texas as the Eagle Ford Shale.  *See id.* at 80.

maps.  *See id.* at 260-61.  There is no evidence that Recif conducted any analysis of the TMS.

During the time it was meeting with Recif, Juniper continued to conduct an analysis of the entire region, obtaining and studying over 50 well logs in the Austin Chalk formation, and continuing to conduct substantial analysis in the TMS.  *See id.* at 255-56, 274-75.  Juniper identified the area in the Austin Chalk formation it believed most economically favorable.  Then Juniper identified the area in the TMS formation it believed most economically favorable.  After those two steps were completed, Juniper focused its interest for the State Line project in the area where the two identified areas intersected.  *See id.* at 265-66.  This became the State Line AOI. *See id.*  There is no evidence that Recif conducted a similar analysis.

Juniper eventually created an Investment Committee Memo ("IC Memo") regarding its analysis of the State Line Leases project.  The IC Memo summarizes Juniper's work that led to its decision to acquire the State Line Leases from Amelia, and contains a detailed analysis of the geology of the area, leasing information, drilling results, projected reserves, and economics.  *See* Gore Report, p. 19.  The IC Memo also contains a detailed financial analysis of wells in the area, and a "thorough risk analysis" including environmental, social and governmental risks.  *See id.* Juniper has presented evidence that the IC Memo contains all the information Juniper

relied upon in deciding where to obtain the State Line Leases.  *See* Schrotel Depo., p. 263; Ogunyomi Depo., p. 219.  The IC Memo identifies no Recif information, and Juniper has presented evidence that it did not rely on any Recif information in making its State Line Leases investment decision.  *See* Schrotel Depo., p. 264; Ogunyomi Depo., p. 220.

Recif has presented no evidence that contradicts Juniper's evidence regarding its own analysis of the State Line Leases prospect.  Instead, Recif argues that Juniper did not have the experience or training necessary to conduct its own analysis in the time permitted.  Specifically, Recif argues that Ogunyomi was Juniper's only degreed geologist and did not begin to work for Juniper until March 18, 2018, giving him only six weeks to complete an independent analysis before the May 3, 2018 investment decision was made.  Although it is undisputed that Ogunyomi was Juniper's only degreed geologist and that he did not begin work for Juniper until March 2018, Juniper has presented uncontroverted evidence that it began work on the State Line Leases project well before March 2018, indeed Juniper was working on the State Line Leases project at least two months before Juniper's first business meeting with Recif in November 2017.  Additionally, Juniper has presented uncontroverted evidence that six weeks was ample time for Juniper to complete the analysis for the State Line Leases investment.  *See* Gore Report, p. 20; Ogunyomi Depo., p. 212.  Indeed,

Ogunyomi testified that six weeks was "absolutely" enough time to conduct the analysis and reach an opinion on the investment.  *See* Ogunyomi Depo., p. 212. Ogunyomi testified that, from his experience with multiple companies, he had developed the ability to go into an area, quickly analyze the data, and form an opinion in usually "a few weeks to two months."  *See id.*

Recif argues, with supporting evidence, that Schrotel had no formal training in either engineering or geology.  There is uncontroverted evidence in the record, however, that Schrotel had been working for Juniper conducting well log analysis since 2014 and had taken several relevant online classes.  During the years before meeting with Recif, Juniper had evaluated and provided capital investment for multiple oil and gas development projects, two involving the Austin Chalk/Eagle Ford formations.  *See* Cumming Depo., pp. 52-53.  One of those two projects was the Rocky Creek Resources ("RCR") project.  *See* Gore Report, p. 18.  Schrotel was Juniper's technical lead on the RCR project, which culminated in the sale of approximately 17,000 acres and 8 wells to Marathon Oil Company.  *Id.*  Perhaps the most compelling evidence refuting Recif's challenge to Schrotel's abilities is Recif's concession that it claimed Schrotel's analysis as its own to solicit investments after discussions with Juniper ended.

The uncontroverted evidence in the record establishes further that Juniper's ability to conduct its own analysis in the time permitted was assisted by information provided to Juniper by Amelia's Kirk Barrell.  Juniper had access to Barrell's extensive analysis of the Austin Chalk, where he had conducted detailed well log analysis on approximately 900 wells.  *See* Kirk Barrell Depo., Exh. 4 to Juniper's Motion, pp. 95-97.  Juniper's "access to Barrell's experience and extensive library of work" facilitated Juniper's quick analysis and decision regarding the State Line Leases.  *See, e.g.*, Gore Report, p. 21.

Recif has failed to present evidence, rather than conjecture by its counsel and principals, that raises a genuine issue of material fact regarding Juniper's ability to conduct its own analysis without using any information provided by Recif.

### 4.    Use of "Mental Impressions" Under the Confidentiality Agreement

Recif argues that even if Juniper did not use Recif's information, Juniper used "mental impressions" it obtained from reviewing that information.  As an initial matter, any "mental impressions" from the Recif information would suggest that one should drill in the area ***west-northwest*** of the Recif AOI in order to maximize potential hydrocarbon volumes.  *See* Gore Report, p. 15.  It is undisputed that the State Line Leases are ***east-northeast*** of the Recif AOI, inconsistent with any "mental impressions" obtained from reviewing Recif's information.

Additionally, the Confidentiality Agreement allows Juniper to use mental impressions. Paragraph 16 of the Confidentiality Agreement provides:

> 16.    RECIF understands and acknowledges that [Juniper] and its Representatives are actively engaged in the business of oil and natural gas exploration, development and operations, and [Juniper] and its Representatives may have current operations in the vicinity of the Properties. Notwithstanding any other provision in this Agreement, RECIF understands and agrees that [Juniper] and its Representatives may now or in the future be working on other projects in such area and may retain mental impressions of [Recif's] Information. The use of such mental impressions is not prohibited by this Agreement. RECIF agrees that neither [Juniper] nor any of its Representatives shall be precluded by the terms of this Agreement from working on or acquiring interests in any properties solely because of such retained mental impressions.

Confidentiality Agreement, ¶ 16.

Recif argues that whether Juniper used the actual Recif information or only mental impressions of that information is a fact question to be resolved by the jury. For the reasons discussed in the preceding sections, Recif has failed to present evidence that raises a genuine issue of material fact in support of the allegation that Juniper used actual Recif information. As a result, the issue is whether any use by Juniper of mental impressions violated the Confidentiality Agreement.[9]

Recif argues that ¶ 16 of the Confidentiality Agreement applies only "if Defendants acquire "interest in any properties solely because of such retained mental

---

[9]    Juniper denies using any mental impressions it obtained from reviewing Recif's information.

impressions."   Recif's Response [Doc. # 153], p. 29.   Recif notes that Juniper

responded during discovery that it did not acquire the State Line Leases "based only

on any retained mental impressions of any Information provided by Recif." *Id.* (citing

Response to Interrogatory 9, Exh. 52 to Response).   Therefore, Recif argues, ¶ 16 does

not apply.   Recif misreads ¶ 16.   The paragraph states that Juniper will not be

"***precluded*** by the terms of this Agreement from working on or acquiring interests in

any properties ***solely because of*** such retained mental impressions."   Confidentiality

Agreement, ¶ 16 (emphasis added).   Pursuant to the unambiguous language in ¶ 16,

Recif agrees that Juniper solely having retained mental impressions of Recif's

information will not preclude Juniper from working on or acquiring interest in

properties in the area.   The language does not provide, as Recif argues, that ¶ 16 is

inapplicable unless Juniper acquires the interest based solely on retained mental

impressions.

Recif argues that ¶ 16 is ambiguous.   In support of this argument, Recif cites

deposition testimony from its principals.   Langlois and Jones testified that, based on

the language in ¶ 16 that Juniper "may have current operations in the vicinity" of

Recif's AOI, they thought ¶ 16 applied only to any current operations Juniper had in

the vicinity of Recif's AOI, not to any future operations Juniper may have.   "Courts

interpreting unambiguous contracts are confined to the four corners of the document,

and cannot look to extrinsic evidence to create an ambiguity." *Addicks Servs., Inc. v. GGP-Bridgeland, LP*, 596 F.3d 286, 294 (5th Cir. 2010); *see also Nat'l Union Fire Ins. Co. of Pittsburgh v. CBI Indus., Inc.*, 907 S.W.2d 517, 520 (Tex. 1995) ("Parol evidence is not admissible for the purpose of creating an ambiguity.").  Paragraph 16 states clearly and unambiguously that notwithstanding any other provision of the Confidentiality Agreement, which would include the statement regarding current operations in the vicinity of Recif's AOI, Recif understands and agrees that Juniper "may now or in the future" be working on other projects the area of Recif's AOI and "may retain mental impressions" of Recif's information.  *See* Confidentiality Agreement, ¶ 16.  The paragraph provides further that the "use of such mental impressions is not prohibited by this Agreement."  *Id*.

Recif has failed to present evidence that raises a genuine issue of material fact to support its claim that Juniper used "mental impressions" of the Recif information.  Moreover, pursuant to ¶ 16 of the Confidentiality Agreement, any use of mental impressions is "not prohibited by [that] Agreement."  *Id*.

### 5.    Conclusion Regarding Use of Recif Information

Recif has failed to present admissible evidence that raises a genuine issue of material fact regarding its claim that Juniper breached the Confidentiality Agreement by using Recif's information in its decision to invest in the State Line Leases.  Indeed,

the uncontroverted evidence in the record demonstrates that Juniper did not improperly use any Recif information or "mental impressions" when it conducted its analysis and reached its decision to obtain the State Line Leases from Amelia.

### C.   Claim that Juniper Improperly Disclosed Recif's Information

Recif alleges that Juniper breached the Confidentiality Agreement by disclosing Recif's information to Michael Rozenfeld[10] and Tope Ogunyomi.  It is undisputed that Juniper disclosed the Recif AOI Map to Rozenfeld and Ogunyomi.[11]  Juniper argues it is entitled to summary judgment on the breach of contract claim as to these disclosures because Recif has presented no evidence of damages.  Recif has not presented evidence that either Rozenfeld or Ogunyomi used the Recif AOI Map in any way.

An essential element of a breach of contract claim is that there be "damages sustained as a result of the breach."  *See Innova Hosp. San Antonio, Ltd. P'ship v. Blue Cross & Blue Shield of Georgia, Inc.*, 892 F.3d 719, 731 (5th Cir. 2018); *Intercontinental Grp. P'ship v. KB Home Lone Star L.P.*, 295 S.W.3d 650, 655 n.26

---

[10]   Michael Rozenfeld worked for Boomtown, LLC, a company with Juniper as its only client.  *See* Michael Rozenfeld Depo., Exh. 28 to Recif's Response [Doc. # 153], pp. 35-36.

[11]   It is unclear that the Recif AOI Map is confidential information covered by the Confidentiality Agreement.  It is not evident from the map, which contains a "box" outline of Recif's AOI, who had an interest in the AOI or why.

(Tex. 2009) (required element in a breach of contract claim is that the plaintiff was in fact damaged by the breach).  Where the plaintiff provides no evidence of damages resulting from an alleged breach, summary judgment for the defendant on the breach of contract claim is appropriate.  *See Univ. Baptist Church of Fort Worth v. Lexington Ins. Co.*, 787 F. App'x 194, 198 (5th Cir. 2019).  The issue before the Court is whether Recif has presented evidence of any damages resulting from Juniper's disclosure of the Recif AOI Map to Rozenfeld and Ogunyomi, not whether Recif has proven the amount of the resulting damages with adequate certainty.

Recif argues that it is entitled to recover nominal damages.  Nominal damages are not recoverable when the alleged harm is "entirely economic and subject to proof."  *Merritt Hawkins & Assocs., L.L.C. v. Gresham*, 861 F.3d 143, 155 (5th Cir. 2017) (citing *MBM Fin. Corp. v. Woodlands Operating Co., L.P.*, 292 S.W.3d 660, 665 (Tex. 2009)).  "[A] breach-of-contract plaintiff who seeks nothing beyond economic damages cannot receive a judgment based on breach alone."  *Intercontinental Grp.*, 295 S.W.3d at 660.  Similarly, a "stand alone finding of breach confers no benefit whatsoever."  *Id*. at 665 n.26.

Recif argues also that it is entitled under the Confidentiality Agreement to an award of attorneys' fees and costs.  Pursuant to ¶ 19 of the Confidentiality Agreement, attorneys' fees and costs are recoverable only where a court of competent jurisdiction

issues a final, non-appealable order finding a breach of contract.  *See* Confidentiality Agreement, ¶ 19.  The award of attorneys' fees and costs are not damages resulting from the alleged breach of the Confidentiality Agreement by the disclosure of the Recif AOI Map to Rozenfeld and Ogunyomi.  Therefore, they do not support Recif's breach of contract claim.

Recif's response to the lack of evidence of damages includes a discussion of a reasonable royalty, citing *Qaddura v. Indo-European Foods, Inc.*, 141 S.W.3d 882, 889-90 (Tex. App. -- Dallas 2004, pet. denied).  It is unclear that this discussion relates to the breach of contract claim relating to the disclosures to Rozenfeld and Ogunyomi.  In any event, under Texas law, contract damages are defined by the plaintiff's actual loss and, therefore, a hypothetical royalty is not recoverable for breach of a confidentiality agreement.  *See CQ, Inc. v. TXU Min. Co., L.P.*, 565 F.3d 268, 278 (5th Cir. 2009).[12]  Like Recif, the plaintiff in *CQ* argued that *Qaddura* permitted recovery of a hypothetical royalty as damages for the breach of a confidentiality agreement.  *See id.* at 278 n.5.  The Fifth Circuit rejected the argument.

Recif has failed to present evidence of damages resulting from the disclosure

---

[12]    The unavailability of a hypothetical reasonable royalty as the measure of damages for the alleged breach of a confidentiality agreement applies to all aspects of the breach of contract claim based on the alleged breaches of the Confidentiality Agreement.  *See CQ*, 565 F.3d at 278.

of the Recif AOI Map to Rozenfeld and Ogunyomi. As a result, Juniper is entitled to summary judgment on this aspect of Recif's breach of contract claim.

### D. Claim that Juniper Breached the Confidentiality Agreement in State Court Proceeding

On January 17, 2019, Recif filed this lawsuit in Texas state court. In its Amended Complaint, Recif alleges that Juniper breached the Confidentiality Agreement while the case was pending in state court by (1) contesting Recif's application for temporary injunctive relief and (2) requiring Recif to post a bond and opposing the release of that bond.

Paragraph 19 of the Confidentiality Agreement provides that Juniper agrees that Recif can seek injunctive relief "without proof of immediate, irreparable and/or actual damages." Confidentiality Agreement, ¶ 19. The paragraph provides further that Juniper agrees to waive any requirement for "securing or posting any bond in connection with the pursuit of" injunctive relief. *See id.*

With reference to the allegations regarding the bond requirements, Rule 684 of the Texas Rules of Civil Procedure requires an order granting a temporary injunction to fix the amount of security to be given by the applicant. This requirement is mandatory, and an order granting a temporary injunction that fails to fix the amount of security "is subject to being declared void and dissolved." *Qwest Commc'ns Corp. v. AT&T Corp.*, 24 S.W.3d 334, 337 (Tex. 2000). Indeed, any agreement to waive the

bond requirement "is immaterial because the failure of the temporary injunction order to comply with rule 684 renders the order void, and 'a party who agrees to a void order has agreed to nothing.'" *City of McAllen v. McAllen Police Officers' Union*, 2011 WL 2175606, *3 n.7 (Tex. App. -- Corpus Christi-Edinburg June 2, 2011,) (quoting *In re Garza*, 126 S.W.3d 268, 271 (Tex. App. -- San Antonio 2003, orig. proceeding).  The provision in the Confidentiality Agreement that Juniper agreed not to require a bond is contrary to the requirement of Rule 684, and any temporary injunction that Recif obtained based on that provision would be void. *See id.*; *see also Qwest*, 24 S.W.3d at 337.

Additionally, the Confidentiality Agreement is dated November 16, 2017, and the lawsuit was filed January 17, 2019.  Paragraph 15 of the Confidentiality Agreement provides that the "obligations under this Agreement shall terminate one year after the date of this Agreement." Confidentiality Agreement, ¶ 15.  As a result, Juniper's obligations under the Confidentiality Agreement, including those under ¶ 19, expired before the lawsuit was filed and before Juniper engaged in the challenged conduct while the case was pending in state court.

Recif argues that ¶ 18 of the Confidentiality Agreement provides that Recif's failure or delay in exercising its rights does not constitute a waiver.  *See* Recif's Response [Doc. # 153], p. 28.  Juniper does not argue that Recif waived any rights.

Instead, Juniper argues that its obligations under the Confidentiality Agreement, including those under ¶ 19, terminated when the contract expired and, therefore, its conduct while the case was pending in Texas state court cannot constitute a breach of the Confidentiality Agreement.  The waiver provision in ¶ 18 is not relevant.

Juniper is entitled to summary judgment on Recif's breach of contract claim based on conduct by Juniper while this case was pending in state court after its obligations under the Confidentiality Agreement terminated.

## IV.   TRADE SECRET MISAPPROPRIATION CLAIM UNDER TUTSA

### A.   Legal Requirements for TUTSA Claim

Under TUTSA, "misappropriation" includes "disclosure or use of a trade secret of another without express or implied consent by a person who (i) used improper means to acquire knowledge of the trade secret . . .."  TEX. CIV. PRAC. & REM. CODE § 134A.002(3); *see also Six Dimensions, Inc. v. Perficient, Inc.*, 969 F.3d 219, 230 (5th Cir. 2020).  To prevail on a trade secret misappropriation claim under TUTSA, the plaintiff must prove: (1) the information at issue is a trade secret; (2) the defendant acquired the trade secret through improper means; and (3) the defendant's improper use of the trade secret harmed the plaintiff.  *See StoneCoat of Tex., LLC v. ProCal Stone Design, LLC*, 426 F. Supp. 3d 311, 340 (E.D. Tex. 2019); *Miner, Ltd. v. Anguiano*, 383 F. Supp. 3d 682, 702 (W.D. Tex. 2019).

## B.    Existence of a Trade Secret

The first element of a TUTSA claim is that the information satisfies the definition of a trade secret.  Under TUTSA, a "trade secret" includes information that:

> (A) the owner of the trade secret has taken reasonable measures under the circumstances to keep the information secret; and

> (B) the information derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the information.

TEX. CIV. PRAC. & REM. CODE § 134A.002(6); *see also Vest Safety Med. Servs., LLC v. Arbor Envtl., LLC*, 2020 WL 4003642, at *4 (S.D. Tex. July 15, 2020). "Information is valuable when it provides the competitor details about a product or service that give them a competitive advantage." *Miner*, 383 F. Supp. 3d at 703 (citing *In re Cooper Tire & Rubber Co.*, 313 S.W.3d 910, 918 (Tex. App -- Houston [14th Dist.] 2010)).

Juniper argues that Recif has presented no evidence that its alleged trade secrets had independent economic value.[13]  Juniper's damages expert, Brent Bersin, testified that the value of Recif's information "would be $0" unless it had utility outside

---

[13]    In its Response to Recif's Motion, filed August 10, 2020, Juniper stated that there was a fact dispute regarding the value of the Recif information.  *See* Response [Doc. # 160], p. 16.  This statement was made, however, prior to the Court's exclusion of the proffered opinion of Recif's damages expert, J. W. Bill Rhea, IV, in the Memorandum and Order [Doc. # 199] entered October 1, 2020.

Recif's AOI.  *See* Brent Bersin Depo., Exh. 58 to Response [Doc. # 160], pp. 259-60.

As discussed above, Recif has failed to present evidence that raises a genuine fact dispute regarding the applicability of its information outside its AOI.  Langlois, Recif's principal, testified that the well logs have no intrinsic value related to evaluating an oil and gas opportunity until and unless they are interpreted and analyzed.[14]  *See* Langlois Depo., p. 359.  Recif did not address Juniper's argument in its Reply or in its Supplement to its Reply.

Juniper has presented evidence, including deposition testimony from Recif's principal, that the Recif information has no independent economic value.  Recif has not presented evidence to the contrary, and has not addressed Juniper's argument. Therefore, Recif has failed to present evidence that raises a genuine issue of material fact that its information has independent economic value as required to qualify as trade secrets under TUTSA.

## C.    Requirement of Improper Use of Trade Secrets

Another essential element of a TUTSA violation is unauthorized use of the trade secret.  *See Universal Plant Servs., Inc. v. Dresser-Rand Grp., Inc.*, 571 S.W.3d

---

[14]    Additionally, as discussed above in Section III.B.1, the well logs are publicly-available information.  Therefore, they cannot be trade secrets.  *See, e.g.*, *Carson Prod. Co. v. Califano*, 594 F.2d 453, 461 (5th Cir. 1979) (noting that "it is elemental that the subject matter of a trade secret must be secret" and "must not be of public knowledge or of a general knowledge in the trade or business").

346, 360 (Tex. App. -- Houston [1st Dist.] 2018, no pet.); *StoneCoat of Texas*, 426 F.

Supp. 3d at 344.  As is discussed above in Section III.B., Recif has failed to present

evidence that raises a genuine issue of material fact regarding Juniper's alleged use

of any trade secrets.  On this basis also, Juniper is entitled to summary judgment on

Recif's trade secret misappropriation claim.

## V.      OTHER STATE LAW CLAIMS

Juniper argues that Recif's remaining state law claims of fraudulent

inducement,   fraudulent   misrepresentation,   civil   conspiracy,   "detrimental

reliance/promissory estoppel," unfair competition, and unjust enrichment are

preempted by TUTSA, TEX. CIV. PRAC. & REM. CODE § 134A.007.  "Where a claim

is based on a misappropriation of a trade secret, then it is preempted by the

[TUTSA]."  *DHI Grp., Inc. v. Kent*, 397 F. Supp. 3d 904, 922 (S.D. Tex. 2019) (citing

*Super Starr Int'l, LLC v. Fresh Tex Produce, LLC*, 531 S.W.3d 829, 843 (Tex. App. -

Corpus Christi 2017, no pet.)); TEX. CIV. PRAC. & REM. CODE § 134A.007(a).  Many

Texas  federal  courts  have  held  that  TUTSA  preempts  claims  regarding  the

misappropriation of information, even if the information is not a trade secret.  *See*

*Richter v. Carnival Corp.*, 2020 WL 1876098, *3 (N.D. Tex. Apr. 15, 2020), and

cases cited therein.  Most district courts in Texas hold that if a plaintiff's tort claim is

premised on the same factual allegations as its claim for trade secret misappropriation,

the claim is preempted by TUTSA.  *See StoneCoat of Texas,*, 426 F. Supp. 3d at 337;

*Computer Sciences Corp. v. Tata Consultancy Servs. Ltd.*, 2020 WL 2487057,*7

(N.D. Tex. Feb. 7, 2020), report and recommendation adopted, 2020 WL 1428941

(N.D. Tex. Mar. 24, 2020); *360 Mortg. Grp., LLC v. Homebridge Fin. Servs., Inc.*,

2016 WL 900577, at *8 (W.D. Tex. Mar. 2, 2016).  In the Southern District of Texas,

a "claim is not preempted if the plaintiff is able to show the claim is based on facts

***unrelated to*** the misappropriation of the trade secret."  *AMID, Inc. v. Medic Alert*

*Found. United States, Inc.*, 241 F. Supp. 3d 788, 825 (S.D. Tex. 2017) (emphasis

added) (Rosenthal, J.).

In this case, with the possible exception of the "detrimental reliance/promissory

estoppel" claim, each of Recif's remaining state law claims is based on the same

factual allegations that underlie the trade secret misappropriation claim.   The

fraudulent inducement claim is based on the allegation that Juniper induced Recif to

disclose its proprietary information.   *See* Complaint, ¶ 66.   The fraudulent

misrepresentation claim is based on the factual allegations that Juniper misrepresented

that they would not misuse Recif's proprietary information, and that Recif relied on

Juniper's representation and shared its proprietary information with Juniper.  *See id.*,

¶¶ 70-71.  In the civil conspiracy claim, Recif alleges that Defendants conspired with

each other to misrepresent that they would not misuse Recif's proprietary information

and to conceal that they were sharing Recif's proprietary information with others. *See id.*, ¶ 74.  In the unfair competition claim and the unjust enrichment claims, Recif alleges that Juniper misappropriated Recif's proprietary information to "bypass" Recif and enter into an oil and gas lease development. *See id.*, ¶¶ 85, 86, 88.

In the Complaint, Recif identifies its proprietary information -- the information on which the state law claims are based -- as "secrets." *See id.*, ¶¶ 11, 13.  Indeed, in the Complaint, Recif alleges that all of its proprietary information constitutes trade secrets. *See id.*, ¶ 77.  Throughout this litigation, Recif has maintained the position that all of its proprietary information qualifies as trade secrets. *See, e.g.*, Recif's Second Amended Answers to Juniper Capital's First Set of Interrogatories, Exh. 38 to Juniper's Motion, p. 5 (Recif's trade secrets include "all business, scientific, technical, lease availability, economic, or engineering information [Recif] generated that was related to its plan for the Recif Prospect that it shared with Juniper"); Recif's First Amended Responses to State Line's First Set of Discovery Requests, p. 11.

Recif's fraudulent inducement, fraudulent misrepresentation, civil conspiracy, unfair competition, and unjust enrichment claims are premised on the same factual allegations as its claim for trade secret misappropriation.  Stated differently, Recif has failed to show that these state law claims are based on factual allegations unrelated to the allegations supporting the trade secret misappropriation claim.  As a result, these

state law claims are preempted by TUTSA.

The factual basis for the promissory estoppel claim is unclear.  Recif alleges only that "Juniper made representations to Recif by conduct and/or word which Recif justifiably relied upon.  As a result of Recif's reliance, Recif changed its position to its detriment."  *See* Complaint, ¶ 83.  To the extent the alleged representations related to the use of Recif's alleged trade secrets, the claim is preempted by TUTSA.

Additionally, although promissory estoppel is normally defensive in nature, "it is an available cause of action to a promisee who relied to his detriment on *an otherwise unenforceable promise*."  *Blackstone Med., Inc. v. Phoenix Surgicals, L.L.C.*, 470 S.W.3d 636, 655 (Tex. App. - Dallas 2015, no pet.) (emphasis added).  The promissory estoppel doctrine presumes that no contract exists.  *Id*. (citing *Subaru of Am., Inc. v. David McDavid Nissan, Inc.*, 84 S.W.3d 212, 226 (Tex. 2002)).  Promissory estoppel "is not applicable to a promise covered by a valid contract between the parties," but may "apply to a promise outside a contract."  *Id*.  Therefore, to the extent Recif's promissory estoppel claim is based on promises in the Confidentiality Agreement, the claim fails as an independent cause of action.[15]

Based on the foregoing, Juniper is entitled to dismissal of Recif's state law

---

[15]    To the extent Recif intended to rely on a different promise, it failed to plead adequate facts in the Complaint or provide an adequate explanation in the summary judgment briefing.  Therefore, any such promissory estoppel claim is dismissed.

claims of fraudulent inducement, fraudulent misrepresentation, civil conspiracy, "detrimental reliance/promissory estoppel," unfair competition, and unjust enrichment as preempted by TUTSA.

## VI.   CONCLUSION AND ORDER

Recif has not presented evidence that raises a genuine issue of material fact in support of its breach of contract and trade secret misappropriation claims.  As a result, Recif's Motion is denied and Juniper's Motion is granted on these two claims.

TUTSA preempts Recif's other state law claims.  The promissory estoppel claim is either preempted by TUTSA or fails as an independent cause of action because it is based on promises covered by the Confidentiality Agreement. Accordingly, it is hereby

**ORDERED** that Juniper's Motion for Summary Judgment [Doc. # 130] is **GRANTED**.  It is further

**ORDERED** that Recif's Motion for Summary Judgment on Breach of Contract and Misappropriation of Trade Secrets [Doc. # 135] is **DENIED**.

SIGNED at Houston, Texas, this **17th** day of **November, 2020**.

NANCY F. ATLAS
SENIOR UNITED STATES DISTRICT JUDGE